**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

JOSLYNN MONTOYA,
COLORADO CROSS-DISABILITY COALITION, a Colorado nonprofit corporation,

     Plaintiffs,

v.

CITY OF BOULDER, COLORADO,

     Defendant.

---

## COMPLAINT

---

Plaintiffs Joslynn Montoya and the Colorado Cross-Disability Coalition hereby bring this Complaint by and through undersigned counsel against the City of Boulder, Colorado, for violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12134, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, and the Colorado Anti-Discrimination Act ("CADA"), Colo. Rev. Stat. § 24-34-802.

### <u>Introduction</u>

1. More than thirty years ago, on July 26, 1990, the ADA became law, establishing the most important federal civil rights law for people with disabilities in the nation's history.

2. Section 504 was passed in 1973, making it unlawful for recipients of federal financial assistance to discriminate against people with disabilities.

3. The Colorado General Assembly amended CADA in 2021 to make clear that state

law also prohibits public entities, including city police departments, from discriminating on the basis of disability in Colorado.

4. The ADA—"a clear and comprehensive national mandate for the elimination of discrimination against people with disabilities," 42 U.S.C. § 12101(b)(1)—was passed to ensure people with disabilities are not discriminated against by, *inter alia*, public entities such as the City of Boulder, Colorado, and its police department.

5. As set forth in this Complaint, the City of Boulder, through its police department, intentionally discriminated against Plaintiff Joslynn Montoya, an individual who is deaf, by failing to ensure effective communication with her, despite Ms. Montoya's multiple requests that the police department provide an American Sign Language ("ASL") interpreter.

6. This discrimination directly resulted in the Boulder Police Department unnecessarily removing Ms. Montoya's then two-year-old and seven-month-old children from her custody based on the police department's ineffective communication with her, which could have been avoided by providing an ASL interpreter as Ms. Montoya requested.

7. Plaintiffs seek a court order compelling Defendant to comply with the ADA, Section 504 and CADA.

8. Plaintiff Joslynn Montoya seeks monetary damages as permitted under these statutes.

9. Plaintiffs seek the recovery of their reasonable attorneys' fees and costs as permitted under these statutes.

2

**Jurisdiction and Venue**

10.     This Court has jurisdiction over the federal claims in this action pursuant to 28 U.S.C. §§ 1331 and 1343, and supplementary jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367(a). Declaratory relief is available pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by 28 U.S.C. § 2202 and Rule 65 of the Federal Rules of Civil Procedure.

11.     Venue is proper within this District pursuant to 28 U.S.C. § 1391.

**Parties**

12.     Plaintiff Joslynn Montoya is and was a resident of Boulder County, Colorado, during all times pertinent hereto.

13.     Plaintiff Joslynn Montoya is deaf, and this impairment substantially limits the major life activities of hearing and speaking.

14.     Ms. Montoya is an individual with a disability.

15.     Plaintiff Colorado Cross-Disability Coalition ("CCDC") is a Colorado nonprofit membership organization whose members are persons with disabilities and their non-disabled allies.

16.     Ms. Montoya is a CCDC member.

17.     Defendant City of Boulder, Colorado ("City") is a home rule municipality, organized pursuant to the Colorado Constitution, Article XX. The Boulder Police Department ("BPD") is a department of the City, and is empowered by the Boulder Municipal Code, Title 2,

3

Chapters 2 and 4, to oversee all police functions in Boulder, Colorado.

18.     On information and belief, the City is a recipient of federal financial assistance as that term is used in Section 504.

19.     Defendant City is a "public entity" as defined under the ADA, 42 U.S.C. § 12131(1)(A) (defining "public entity" to mean "any . . . local government") and 28 C.F.R. § 35.104 (same), and as defined under CADA, Colo. Rev. Stat. § 24-34-301(5.4)(a) (same).

## Facts

20.     On May 17, 2022, Ms. Montoya was residing in a domestic violence shelter located in Boulder, Colorado, along with her two young children, S.L. and J.M., to avoid a former partner who had recently found her.

21.     On May 17, 2022, S.L. was two years old.

22.     On May 17, 2022, J.M. was seven months old.

23.     Ms. Montoya is deaf and primarily communicates using American Sign Language ("ASL").

24.     ASL is a separate and distinct language from English, using its own unique phrases, descriptions, syntax and grammatical rules.

25.     ASL is a physical language, utilizing one's hands, arms, face, torso, and movements to convey meaning.

26.     Although Ms. Montoya can verbalize some and occasionally can lip-read some common words or phrases under some conditions, she is not proficient in lip-reading and is

4

unable to effectively communicate verbally or through lip-reading beyond such common words and phrases under those conditions, particularly with respect to complex matters, like those identified in this Complaint.

27.     Similarly, although Ms. Montoya can read and write some in English, she is unable to communicate effectively about complex matters, like those identified in this Complaint, through written English.

28.     Ms. Montoya does not read or write proficiently or effectively.

29.     Ms. Montoya typically relies on sign language interpreters or other auxiliary aids to communicate with people who do not use sign language.

30.     Video Relay Service ("VRS") allows people with hearing disabilities who use sign language to communicate with voice telephone users through video equipment. The video link allows a sign language interpreter to view and interpret the party's signed conversation and relay the conversation back and forth with a voice caller. VRS is available on iPhone and Android operating systems by using video relay phone apps.

31.     VRS is in contrast to a video call. A video call utilizes a camera and a screen and can be used by people to communicate via a real time audio/visual platform offered by a multitude of phone and computer apps or programs, including by individuals who are deaf to communicate with each other directly in sign language.

32.     VRS is not a substitute for a qualified sign language interpreter.

33.     At approximately 3:00 p.m., on May 17, 2022, Ms. Montoya was approached by

Amber, an employee at the shelter, who attempted to speak to Ms. Montoya.

34.     Ms. Montoya was unable to understand Amber's communication but recalled using VRS on her cell phone to communicate with shelter staff, including Amber, in the past when discussing simple matters, so Ms. Montoya used VRS to communicate with Amber.

35.     During that conversation, Ms. Montoya understood that Amber stated that Ms. Montoya and her children would need to leave at 5:00 p.m. that day, and as 5:00 p.m. approached, Amber returned to Ms. Montoya's room to speak with her and check on her progress.

36.     Ms. Montoya once again communicated with Amber via VRS. As part of that communication, Ms. Montoya understood that the shelter was permitting Ms. Montoya until 7:00 p.m. that day to finish packing and leave the shelter with S.L. and J.M.

37.     Ms. Montoya then returned to packing her room to leave by 7:00 p.m.

38.     In addition to packing her and her children's belongings in order to leave the shelter by what she understood to be a 7:00 p.m. deadline, Ms. Montoya was simultaneously caring for S.L. and J.M., contacting Sean Montoya, her then-romantic partner, current husband, and the children's father,[1] to pick the three of them up at the shelter, and contacting her advocate

---

[1] Ms. Montoya was known by the surname "Alba" during the events described in this Complaint, which is reflected in Defendant's reports and records. In addition, Mr. Montoya has been known by the surname "Longdo," though, due to redactions in the records Plaintiffs received from Defendant, Plaintiffs are unsure which surname is recorded in Defendant's reports and records.

with Deaf Overcoming Violence through Empowerment ("DOVE") to secure accommodations

for the night for her, S.L. and J.M.

39.     DOVE is a nonprofit organization that works with Deaf, DeafBlind,

DeafDisabled, and Hard of Hearing ("DDBDDHH") domestic violence survivors "to ensure

victim rights are met throughout their journey towards healing." DOVE, About Us,

https://deafdove.org/about-us/ (last visited June 1, 2023). DOVE's "priority is communication

access and culturally responsive services for DDBDDHH victims/survivors within the legal,

medical, and human services systems." *Id*.

40.     Unbeknownst to Ms. Montoya, the shelter staff summoned the BPD to the shelter

at around 3:30 p.m., for reasons unknown to Ms. Montoya.

41.     At approximately 5:30 p.m., Ms. Montoya was on a video call with Mr. Montoya,

who is also deaf, when a BPD officer suddenly appeared at her door.

42.     According to reports produced by the BPD, the first BPD officer to appear at Ms.

Montoya's door was Officer C. Davick, who was followed shortly thereafter by Sergeant A.

Wise and Officer A. Stiso, and sometime later by Sergeant B. Winn (collectively, "BPD

Agents").

43.     The BPD Agents knew that Ms. Montoya was deaf before they arrived.

44.     According to a report written by Sergeant Wise following the interaction, he

"called Officer Davick to assist as she knows ASL."

45.     Officer Stiso also noted that "Ofc. Davick knows sign language and was needed

to communicate with" Ms. Montoya.

46.     When Officer Davick arrived at Ms. Montoya's room, S.L. and J.M. were asleep while Ms. Montoya was packing and on a video call with Mr. Montoya discussing their plan for the night after Ms. Montoya finished packing.

47.     Because Ms. Montoya and Mr. Montoya both use ASL, they are able to communicate directly with each other using ASL while on a video call.

48.     Although the BPD Agents knew that Ms. Montoya was deaf and needed an ASL interpreter to communicate, they failed to provide an ASL interpreter during all BPD interactions with Ms. Montoya on May 17, 2022.

49.     For example, when Officer Davick attempted to communicate with Ms. Montoya, Ms. Montoya saw that Officer Davick was attempting to fingerspell.

50.     Fingerspelling is not a language of its own, and it is not ASL; it generally is used to spell out a word that does not have a sign.

51.     None of the BPD Agents present during this encounter ever attempted to communicate with Ms. Montoya using ASL.

52.     Unlike ASL, fingerspelling uses the English alphabet to spell out words and phrases in English, one letter at a time.

53.     Ms. Montoya cannot communicate effectively using fingerspelling, particularly for complex communication as occurred between her and the BPD Agents.

54.     Ms. Montoya was able to recognize that Officer Davick fingerspelled the words

"trespass" and "arrest"; these terms confused Ms. Montoya because she was in her room packing and making arrangements to leave by 7:00 p.m.

55.     Ms. Montoya requested that Officer Davick and the other BPD Agents provide her with a sign language interpreter for their communication.

56.     Ms. Montoya saw Officer Davick shake her head, indicating what Ms. Montoya understood to be "no" in response to her request for a sign language interpreter.

57.     Officer Davick continued fingerspelling what Ms. Montoya believed to be that she needed to leave the shelter by 5:00 p.m.

58.     Ms. Montoya attempted to communicate to Officer Davick that she was confused because she understood that she had until 7:00 p.m. to leave and that she needed a sign language interpreter to communicate with the BPD Agents. Ms. Montoya does not know if Officer Davick understood what she was trying to say.

59.     Between attempting to read Officer Davick's lips and understand Officer Davick's finger spelling and gestures, Ms. Montoya believed that Officer Davick was reiterating that Ms. Montoya needed to leave the shelter by 5:00 p.m.

60.     Ms. Montoya attempted to explain to the BPD Agents, using ASL, vocalizing and gesturing, that she needed a sign language interpreter to ensure effective communication between her and the BPD Agents. Ms. Montoya does not know if the BPD Agents understood what she was trying to tell them.

61.     Officer Davick appeared to shake her head "no" in response to Ms. Montoya

again and continued to speak and gesture to Ms. Montoya, although Ms. Montoya was unable to understand what Officer Davick was attempting to communicate.

62.     According to a report authored by Officer Davick following the incident, Ms. Montoya "became animated telling us that we needed to comply with ADA rules."

63.     As similarly reported in Sergeant Wise's report, Ms. Montoya "began explaining to us that we could only communicate with her through and [sic] ADA certified interpreter."

64.     Realizing that the BPD Agents were denying or ignoring her requests for a sign language interpreter, Ms. Montoya contacted her advocate with DOVE via video call hoping that her advocate could convince the BPD Agents that she needed a sign language interpreter.

65.     On information and belief, Ms. Montoya's DOVE advocate has a hearing-related disability affecting her ability to communicate.

66.     Ms. Montoya's DOVE advocate communicates with her in ASL.

67.     Ms. Montoya asked her DOVE advocate to communicate to the BPD Agents that Ms. Montoya needed a sign language interpreter, and Ms. Montoya and her DOVE advocate also communicated regarding Ms. Montoya's plan about where she would go with her children after she left the shelter that evening.

68.     Ms. Montoya's DOVE advocate told Ms. Montoya that DOVE would reserve a room and pay for Ms. Montoya and her children to stay in a hotel for the night, and that Ms. Montoya would need to take her identification and a credit or debit card that could be used for a deposit on the room when she got to the hotel.

69.     Ms. Montoya had her identification and a debit card that she intended to use for the deposit on the room, which she communicated to her DOVE advocate, and her DOVE advocate made a reservation for her and her children to stay at the Travelodge located nearby in Longmont, Colorado.

70.     Ms. Montoya then handed her cell phone to the BPD Agents to communicate with her DOVE advocate so her advocate could explain that Ms. Montoya needed a sign language interpreter to ensure effective communication.

71.     After brief and seemingly ineffective communication between the DOVE advocate and Ofc. Davick, the BPD Agents relegated their communication with the DOVE advocate to text messages due to the advocate's own disability.

72.     According to Officer Davick: "After a difficult video interview it was decided that [Ms. Montoya's DOVE advocate] and Sgt. Wise would communicate on text message about the plan. The reason for the text messages was because [the DOVE advocate] was also hard of hearing."

73.     Ms. Montoya recognized that the situation was continuing to deteriorate, prompting her to persist in requesting that the BPD Agents provide a sign language interpreter to avoid miscommunications in any way she could, including in ASL, through gestures and through vocalization.

74.     Rather than provide Ms. Montoya with a sign language interpreter, the BPD Agents engaged in what Sergeant Wise deemed "a cyclical argument" with her and threatened

11

her with arrest.

75.     Ms. Montoya was unsure exactly what the BPD Agents were communicating, but she believed they were continuing to indicate that she needed to leave the shelter or she would be in trouble with the BPD Agents.

76.     In an effort to get the BPD Agents to provide a sign language interpreter to avoid miscommunication, Ms. Montoya then contacted her case worker, Michelle, with the Boulder County Department of Housing and Human Services ("HHS").

77.     As Officer Davick reported, Ms. Montoya "also called child protective services where I spoke on a video with a woman named Tracie, I also diverted this person to Sgt. Wise for clarity and better communication."

78.     Ms. Montoya tried to use every available method to communicate her need for a sign language interpreter to the BPD Agents, but the BPD Agents refused to provide her with a sign language interpreter.

79.     Ultimately, the BPD Agents learned through the exchange of text messages with Ms. Montoya's DOVE advocate that DOVE would pay for a hotel room for Ms. Montoya and her children for the night and that Ms. Montoya would need her identification and a credit or debit card for a deposit.

80.     According to Sergeant Wise's report, Ms. Montoya's DOVE advocate "advised me that she would need an ID and the information from her ID to book the room and [Ms. Montoya] would be responsible for the deposit via credit card."

81.     Officer Davick similarly recorded in her report, "it would be offered that [DOVE] would pay the hotel stay of [sic] she could pay the security deposit on a credit card/ debit card and provide an ID for the booking."

82.     Officer Davick's report continued, Ms. Montoya "complied with providing her ID."

83.     However, due to breakdowns in communication and her inability to communicate effectively in ASL, Officer Davick mistakenly believed that Ms. Montoya "was not able to provide a security deposit with a credit or debit card."

84.     Sergeant Wise similarly misunderstood the situation, incorrectly believing that Ms. Montoya was unable to provide a credit or debit card for a security deposit and writing in his report: "After explaining to [Ms. Montoya] that she would be responsible for the deposit she made it clear that she did not have money to cover the deposit."

85.     Ms. Montoya in fact did have a debit card and funds she planned to use for the security deposit, and, in fact, used this debit card to pay the security deposit later that night at the hotel in Longmont reserved and paid for by DOVE.

86.     Because of a lack of effective communication, the BPD Agents incorrectly concluded that Ms. Montoya and her children would not be able to utilize the DOVE-reserved hotel that evening because Ms. Montoya did not have a debit card to use for a security deposit.

87.     The BPD Agents then unilaterally determined that they would remove S.L. and J.M. from Ms. Montoya's custody for the night.

88.     As Sergeant Wise reported, "I then call [sic] Sergeant Winn again and advised him that there was no plan in place for [Ms. Montoya] or her children. The decision was then made to place the children on a hold."

89.     Had the BPD Agents provided Ms. Montoya with a sign language interpreter for their communication, Ms. Montoya would have been able to inform the BPD Agents and they likewise would have understood both that she had a debit card upon which she could put a security deposit and also that she had a plan in place for her and her children for the night.

90.     Without a sign language interpreter to facilitate effective communication among Ms. Montoya and the BPD Agents, both the BPD Agents and Ms. Montoya lacked equal access to all information shared and did not have a meaningful role in the conversation and decisions made that day.

91.     As documented by Sergeant Wise, shortly after the "decision was then made to place the children on a hold[,]" he contacted HHS "to respond as we would be removing the children."

92.     Eventually an HHS agent, Adam, arrived, though it is unclear whether his arrival was the result of Ms. Montoya's communication with her HHS case worker, Sergeant Wise's contact with HHS after the decision to remove Ms. Montoya's children, or both.

93.     In either case, once Adam arrived, he assisted Ms. Montoya with arrangements to have the children's aunt (Mr. Montoya's sister) take in the children for the night, because the BPD Agents refused to allow Ms. Montoya to keep them with her that night.

14

94.     Adam then transported S.L. and J.M. from the shelter to Mr. Montoya's sister's house, and Ms. Montoya and Mr. Montoya went to a hotel room for the night.

95.     The BPD Agents were on the scene for approximately five hours by the time S.L. and J.M. were taken from Ms. Montoya.

96.     During the entire interaction, Ms. Montoya repeatedly requested that the BPD Agents provide her with a sign language interpreter.

97.     The BPD Agents did not provide Ms. Montoya with a sign language interpreter despite her repeated requests for one.

98.     In the absence of a sign language interpreter, Ms. Montoya was not able to understand everything the BPD Agents asked of her and told her, and she was not able to communicate her responses or other information to the BPD Agents such that they understood her.

99.     At no point in their interaction with Ms. Montoya did any of the BPD Agents attempt to determine if Ms. Montoya understood what they were trying to communicate to her.

100.    At no point in their interaction with Ms. Montoya did any of the BPD Agents demonstrate that Ms. Montoya did not require a sign language interpreter.

101.    Given the BPD's failure to verify or gauge Ms. Montoya's understanding of what the BPD Agents had been attempting to communicate to her, they assumed she was defiant rather than confused.

102.    In their reports, Ofc. Stiso referred to Ms. Montoya as "belligerent" and "actively

15

resisting" and Ofc. Davick as referred to Ms. Montoya as "defiant" and "less than cooperative."

103.    The BPD also assumed that Ms. Montoya was unemotional about her children rather than unaware of the threat to remove them and focused on attempting to secure effective communication with the BPD Agents to avoid misunderstandings. Ofc. Wise speculated that Ms. Montoya was "nonchalant" about her children and "they did not matter."

104.    The BPD Agents misunderstood the situation and erroneously believed that Ms. Montoya did not have a debit card to use to pay for a security deposit.

105.    The BPD Agents' misunderstanding precipitated their unilateral decision to remove S.L. and J.M. from Ms. Montoya's custody.

106.    Ms. Montoya's communication with the BPD Agents and the BPD Agents' communication with Ms. Montoya involved very important and complicated matters, including her being investigated for potentially having committed a crime or crimes, being threatened with arrest, being threatened with the BPD Agents removing her children from her, and the BPD Agents actually removing her children from her, in a highly emotionally-charged context that involved multiple individuals and multiple languages.

107.    Ms. Montoya and the BPD Agents were unable to effectively communicate with each other as a result of the BPD Agents' failure to provide a sign language interpreter.

108.    Despite Ms. Montoya's repeated requests for a sign language interpreter, including as documented by the BPD Agents, Defendant failed to provide Ms. Montoya with a sign language interpreter on May 17, 2022.

16

109.     Despite Ms. Montoya's repeated requests for a sign language interpreter, as documented by the BPD Agents, Defendant failed to provide Ms. Montoya with any auxiliary aids and services on May 17, 2022, other than Officer Davick's attempted communication through fingerspelling.

110.     Defendant denied Ms. Montoya the opportunity and ability to meaningfully access and participate in her interviews with the BPD.

111.     The following day, Ms. Montoya began working with her HHS case worker to get her children returned to her.

112.     As a result of the BPD Agents' unilateral decision to remove S.L. and J.M. from Ms. Montoya, S.L. and J.M. were kept from Ms. Montoya's custody and care until mid-July, when both children were returned to Ms. Montoya.

113.     During that time and because of the BPD Agents' unilateral decision to remove S.L. and J.M. from Ms. Montoya, Ms. Montoya was forced to work with and through HHS to visit her children.

114.     Had the BPD Agents not removed S.L. and J.M. from Ms. Montoya's custody on May 17, 2022, Ms. Montoya would not have been required to work with and through HHS to visit her children.

115.     Ms. Montoya was forced to work with and through HHS to regain custody of S.L. and J.M. because of the BPD Agents' unilateral decision to remove them from her custody on May 17, 2022.

116.     Had the BPD Agents not removed S.L. and J.M. from Ms. Montoya, Ms. Montoya would not have been required to establish to HHS that she was fit to parent her own children before taking custody of them again.

117.     When the BPD Agents took S.L. and J.M. from Ms. Montoya, Ms. Montoya had been tandem breastfeeding both children, S.L. and J.M.

118.     During the time that S.L. and J.M. were kept from Ms. Montoya, Ms. Montoya ceased lactating.

119.     Breastfeeding provides physical, mental and emotional benefits to both mothers and children.

120.     The BPD Agents denied S.L. and Ms. Montoya these physical, mental and emotional benefits when the BPD Agents separated them.

121.     The BPD Agents denied J.M. and Ms. Montoya these physical, mental and emotional benefits when the BPD Agents separated them.

122.     These physical, mental and emotional benefits that the BPD Agents denied to Ms. Montoya, S.L. and J.M. are irreplaceable.

123.     Since regaining custody of S.L. and J.M., Ms. Montoya has been required to purchase and use formula to feed J.M.

124.     Removing children as young as S.L. and J.M. from their parent has both psychological and emotional harmful consequences for such parents and children.

125.     The removal of S.L. from Ms. Montoya has had harmful psychological and

18

emotional consequences for S.L. and Ms. Montoya.

126.    The removal of J.M. from Ms. Montoya has had harmful psychological and emotional consequences for J.M. and Ms. Montoya.

127.    The removal of S.L. and J.M. from Ms. Montoya has had harmful psychological and emotional consequences on Ms. Montoya as a parent with a disability who has a child removed simply because she needed auxiliary aids and services.

128.    CCDC's purpose is to promote independence, self-reliance, and full participation for people with all types of disabilities, and to combat discrimination against individuals with disabilities, through advocacy, education, research and training.

129.    As a part of its purpose, CCDC seeks to ensure that individuals who are deaf and hard-of-hearing have access to—and do not encounter discrimination in—participating equally in government services, including communication with law enforcement agents.

130.    CCDC engages in extensive outreach as well as advocacy and educational efforts to promote access for and combat discrimination against people with disabilities.

131.    On August 15, 2022, CCDC, on behalf of Ms. Montoya, requested the following documents from the BPD pursuant to the Colorado Open Records Act and Colorado Criminal Justice Records Act:

(1) Copies of all policies, procedures, post orders, and other writings, public records, and/or criminal justice records regarding communication between agents of the Boulder Police Department and deaf or hard of hearing individuals.

(2) Copies of all policies, practices, and procedures regarding the provision of

19

auxiliary aids and services to deaf or hard of hearing individuals.

(3) Copies of all policies, procedures, post orders, and other writings, public records, and/or criminal justice records regarding the authority of agents of the Boulder Police Department to separate children from their parents or guardians.

132.    In response to CCDC's request, the BPD produced six documents, which totaled nineteen pages.

133.    Only one document produced by the BPD involves communication with deaf and hard of hearing individuals and the provision of auxiliary aids and services to them, Standard Operating Procedures section 9116-5, entitled "Interpreter Services," which states in full: "Members use Voiance for interpreter needs. This service is for BPFC only. BPD Officers and Detectives and BFD personnel are directed to use CTS."

134.    On information and belief, the BPD does not have any policies in place regarding communications with persons with disabilities, including a commitment to effective communication, factors to consider when determining how to communicate with an individual with a disability, procedures for obtaining auxiliary aids and services, types of auxiliary aids and services, primary consideration to an individual's requested auxiliary aids and services, or training.

135.    CCDC has several members, including Ms. Montoya, who live, work or travel in Boulder, Colorado.

136.    CCDC has several members, including Ms. Montoya, who are deaf or hard of hearing and require appropriate auxiliary aids and services to effectively communicate in a

variety of scenarios.

137.    CCDC's mission is to advocate for social justice for people with all types of disabilities.

138.    CCDC's purposes are to promote independence, self-reliance, and full and equal participation for people with all types of disabilities and to combat discrimination against individuals with disabilities through advocacy, education, research and training. As a part of that purpose, CCDC works to ensure that individuals with disabilities who are deaf or hard of hearing do not face discrimination by public entities like Defendant.

139.    The interests that CCDC seeks to protect—ensuring that Defendant provides appropriate auxiliary aids and services for effective communication with deaf individuals, including individuals who require sign language interpreters for effective communication, and equal opportunity to participate in government programs—are germane to CCDC's purpose.

140.    The elimination of discrimination, such as that by the Defendant described herein, is at the core of CCDC's organizational purpose.

141.    CCDC provides training to its advocates and the public regarding effective communication for deaf and hard of hearing individuals, including to public entities regarding their obligations to ensure effective communication with deaf and hard of hearing individuals.

142.    CCDC engages in extensive outreach, advocacy, and educational efforts to promote access for and combat discrimination against people with disabilities. These efforts and CCDC's purpose have been and continue to be adversely affected by Defendant's violations of

the ADA, Section 504 and CADA.

143.    On information and belief, in the absence of appropriate and enforced policies, practices and procedures, Defendant's law enforcement agents and officers will fail to ensure effective communication with, and fail to provide appropriate auxiliary aids and services to, any and all deaf and hard of hearing individuals with whom Defendant's law enforcement agents and officers interact.

144.    CCDC members who are deaf and hard of hearing in the Boulder, Colorado area, including Ms. Montoya, are likely to encounter Defendant's law enforcement officers and agents in the future, both voluntarily and involuntarily, and are likely to be denied effective communication with Defendant's law enforcement officers and agents.

145.    In the absence of the injunction sought herein, Defendant will continue to discriminate against individuals with disabilities who are deaf and hard of hearing, including without limitation CCDC members, by denying them effective communication.

146.    CCDC members are injured by Defendant's failure to ensure effective communication with deaf and hard of hearing individuals.

147.    CCDC's members who are deaf or hard of hearing have been injured and will continue to be injured by Defendant's refusal to comply with the ADA, Section 504 and CADA.

**First Claim for Relief**
(Violation of Title II of the ADA, 42 U.S.C. §§ 12131–12134)

148.    Plaintiffs reallege and incorporate by reference the allegations set forth in the remainder of this Complaint as if fully set forth herein.

149.    The ADA was enacted, in part, "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), based on Congressional findings that "physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination." *Id*. § 12101(a)(1).

150.    Congress further found that "discrimination against individuals with disabilities persists in such critical areas as . . . access to public services," *id*. § 12101(a)(3), and "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of . . . communication barriers, . . . failure to make modifications to existing facilities and practices, . . . and relegation to lesser services, programs, activities, benefits . . . or other opportunities." *Id*. § 12101(a)(5).

151.    Congress required the United States Attorney General to promulgate regulations implementing, *inter alia*, the communication access requirement of Title II. *Id*. § 12134(a).

152.    In response, the United States Department of Justice ("DOJ") promulgated regulations found, in pertinent part, in 28 C.F.R. Part 35.

153.    Those regulations are entitled to substantial deference and have the force of law. *Marcus v. Kansas Dep't of Revenue*, 170 F.3d 1305, 1306 n.1 (10th Cir. 1999).

154.    Title II of the ADA provides in pertinent part: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

155.    Defendant's law enforcement activities, including those described herein, constitute a program, service or activity of the City.

156.    Plaintiff Montoya is qualified to participate in Defendant's services, programs and activities, including its law enforcement activities, within the meaning of Title II. *See* 42 U.S.C. § 12131(2).

157.    The ADA requires that a "public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1).

158.    In addition, the ADA sets forth that a "public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." *Id*. § 35.160(b)(1).

159.    "Auxiliary aids and services" includes, *inter alia*, "[q]ualified interpreters." *Id*. § 35.104.

160.    A "qualified interpreter" is an interpreter who "is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary" and includes "sign language interpreters." *Id*.

161.    DOJ guidance explains that "not all interpreters are qualified for all situations . . . . In addition, someone with only a rudimentary familiarity with sign language or finger spelling is not qualified . . . ." 28 C.F.R. pt. 35, app. A at 612 (2021).

162.    In selecting an appropriate auxiliary aid or service, "[t]he type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." *Id*. § 35.160(b)(2).

163.    DOJ guidance notes that this provision is consistent with "longstanding policy," citing *The Americans with Disabilities Act Title II Technical Assistance Manual Covering State and Local Government Programs and Services*, section II–7.1000, available at www.ada.gov/taman2.html ("Sign language or oral interpreters, for example, may be required when the information being communicated in a transaction with a deaf individual is complex, or is exchanged for a lengthy period of time. Factors to be considered in determining whether an interpreter is required include the context in which the communication is taking place, the number of people involved, and the importance of the communication."). 28 C.F.R. pt. 35, app. A at 668 (2021).

164.     ADA regulations further explain that "[i]n order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 35 C.F.R. § 35.160(b)(2).

165.     Moreover, in selecting the auxiliary aid or service, "a public entity shall give primary consideration to the requests of individuals with disabilities." *Id.*

166.     As clarified in the DOJ's commentary to this regulation:

> The second sentence of § 35.160(b)(2) of the final rule restores the "primary consideration" obligation set out at § 35.160(b)(2) in the 1991 title II regulation. . . . As noted in the preamble to the 1991 title II regulation, and reaffirmed here: "The public entity shall honor the choice [of the individual with a disability] unless it can demonstrate that another effective means of communication exists or that use of the means chosen would not be required under § 35.164.

28 C.F.R. pt. 35, app. A at 668 (2021) (alterations in original).

167.     This commentary explains that "[d]eference to the request of the individual with a disability is desirable because of the range of disabilities, the variety of auxiliary aids and services, and different circumstances requiring effective communication." *Id.* (internal quotation marks and citation omitted).

168.     Defendant excluded Ms. Montoya from participation in, denied her the benefits of its services, programs, and/or activities, and/or subjected her to discrimination on the basis of her disability, in violation of Title II and its implementing regulations.

169.     Such discrimination includes but is not limited to:

      a.      denying Ms. Montoya the opportunity to participate in or benefit from an aid, benefit, or service, 28 C.F.R. § 35.130(b)(1)(i);

      b.      failing to ensure that communications with Ms. Montoya are as effective as communications with others, *see id*. § 35.160(a)(1);

      c.      failing to furnish appropriate auxiliary aids and services where necessary to afford Plaintiffs an equal opportunity to participate in, and enjoy the benefits of, Defendant's services, programs, or activities, *see id*. § 35.160(b)(1);

      d.      failing to provide a qualified interpreter, *id*.; and,

      e.      failing to give primary consideration to the requests of Ms. Montoya concerning the types of auxiliary aids and services necessary, *see id*. § 35.160(b)(2).

170.    Defendant denied Ms. Montoya appropriate auxiliary aids and services during the more than five-hour interaction with Ms. Montoya, despite her repeated requests for a sign language interpreter, during which time Defendant's BPD Agents investigated Ms. Montoya for potentially having committed a crime or crimes, threatened her with arrest and ultimately made the unilateral decision to remove her children from her custody.

171.    Defendant denied Ms. Montoya effective communication with Defendant's BPD Agents.

172.    Defendant has discriminated against Ms. Montoya on the basis of her disability.

173.     Defendant's failure to ensure effective communication with Ms. Montoya caused Ms. Montoya to suffer greater injury than others similarly situated and without a disability.

174.     Ms. Montoya has been, and will continue to be, injured, damaged and aggrieved by Defendant's discrimination.

175.     In the absence of appropriate and enforced policies, practices and procedures, Ms. Montoya and other deaf and hard of hearing individuals, including other CCDC members who are deaf or hard of hearing, will be subjected to discrimination by Defendant on the basis of disability.

176.     Defendant's actions described in this Complaint were intentional or were taken with deliberate indifference to the strong likelihood that pursuit of its questioned policies or practices would likely result in a violation of Ms. Montoya's federally protected rights.

177.     Plaintiff Montoya and Plaintiff CCDC's members have been injured, damaged and aggrieved by, and in the absence of the injunction requested herein will continue to be injured, damaged and aggrieved by, Defendant's discrimination.

**Second Claim for Relief**
(Violation of Section 504, 29 U.S.C. § 794)

178.     Plaintiffs reallege and incorporate by reference the allegations set forth in the remainder of this Complaint as if fully set forth herein.

179.     Section 504 provides in pertinent part that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his

disability, be excluded from the participation in, be denied the benefits of, or be subjected

to discrimination under any program or activity receiving Federal financial assistance."

180.    The Rehabilitation Act is interpreted consistently with the ADA. *Cohon ex rel.*

*Bass v. New Mexico Dep't of Health*, 788 F. Supp. 2d 1245, 1253 n.5 (D.N.M. 2009), *aff'd*, 646

F.3d 717 (10th Cir. 2011).

181.    Ms. Montoya is a qualified individual with a disability within the meaning of

Section 504 and its implementing regulations because she is eligible to receive the services of

and participate in the programs and activities of the City.

182.    Defendant, including the BPD, constitutes a "program or activity." 29 U.S.C. §

794(b)(1)(A)-(B) (defining "program or activity" as "all operations of . . . a department, agency, .

. . or other instrumentality of a State or local government; or . . . the entity of such State or local

government that distributes such assistance and each such department or agency (and each other

State or local government entity) to which the assistance is extended, in the case of assistance to

a State or local government").

183.    Upon information and belief, Defendant receives federal financial assistance

within the meaning of Section 504 and its implementing regulations.

184.    Defendant's acceptance and receipt of federal financial assistance constitutes its

agreement not to discriminate against qualified individuals with disabilities, including Ms.

Montoya.

185.    Defendant's agreement not to discriminate against qualified individuals with disabilities is a direct benefit of Defendant's bargain with the federal government that is provided to individuals with disabilities, including Ms. Montoya.

186.    Ms. Montoya, as a person with a disability, is an intended third-party beneficiary of Defendant's agreement with the federal government to comply with, *inter alia*, Section 504 and Title II of the ADA in its acceptance of federal financial assistance.

187.    Ms. Montoya had an expectation interest in Defendant, as a recipient of federal financial assistance, providing her with a sign language interpreter as necessary to ensure effective communication with the BPD Agents, which Defendant denied her.

188.    Ms. Montoya had an expectation interest in Defendant, as a recipient of federal financial assistance, providing her with meaningful access to communication with the BPD Agents who were investigating potential criminal activity, threatening Ms. Montoya with arrest and contemplating and actually removing Ms. Montoya's children from her custody, due to Defendant's agreement to comply with federal disability discrimination laws in its acceptance of federal financial assistance, which Defendant denied her.

189.    Upon information and belief, the federal government has substantially performed its obligations in its agreement to provide federal financial assistance to Defendant and is or was willing and able to perform its remaining obligations.

190.    Defendant excluded Ms. Montoya from participation in, denied her the benefits of, and subjected her to discrimination in its programs and/or activities solely on the basis of

disability in violation of Section 504 and its implementing regulations as more fully described in this Complaint.

191.     Such discrimination includes but is not limited to:

    a.      denying Ms. Montoya the opportunity to participate in Defendant's programs and activities, 28 C.F.R. § 42.503(b)(1)(i);

    b.      denying Ms. Montoya an equal opportunity to achieve the same benefits that others achieve in Defendant's programs and activities; *id.* §42.503(b)(1)(ii);

    c.      failing to ensure that communications with Ms. Montoya were effective, *see id*. § 42.503(e); and/or

    d.      failing to furnish appropriate auxiliary aids and services where refusal impaired and/or excluded Ms. Montoya from participation in a program or activity, *id*. § 42.503(f).

192.     Ms. Montoya has been subjected to discrimination by Defendant, as described in this Complaint, solely on the basis of Ms. Montoya's disability, including the failure to provide auxiliary aids and services and to ensure effective communication.

193.     Defendant's failure to ensure effective communication with Ms. Montoya caused Ms. Montoya to suffer greater injury than others similarly situated and without a disability.

194.     As a direct, proximate and foreseeable consequence of Defendant's violations alleged above, Defendant injured, damaged and aggrieved Ms. Montoya.

195.     As a direct, proximate and foreseeable result of Defendant's discrimination, Ms. Montoya suffered the loss of opportunity to obtain a benefit or avoid a loss, including but not limited to the benefit of meaningful participation in her interaction with BPD and the loss of custody of S.L. and J.M.

196.     As a direct, proximate and foreseeable consequence of Defendant's denial of effective communication to Ms. Montoya, Defendant injured, damaged and aggrieved Ms. Montoya.

197.     As a direct, proximate and foreseeable result of Defendant's discrimination against Ms. Montoya, Ms. Montoya was damaged, including but not limited to the loss of custody of S.L. and J.M. and the need to follow governmental processes to regain custody.

198.     As a direct, proximate and foreseeable result of Defendant's discrimination against Ms. Montoya, she has suffered mental, emotional, and psychological injuries, including additional injuries associated with her caring for the mental, emotional and psychological injuries to S.L. and J.M. resulting from Defendant's removing them from Ms. Montoya's custody.

199.     In the absence of appropriate and enforced policies, practices and procedures, Ms. Montoya and other deaf and hard of hearing individuals, including other CCDC members who are deaf or hard of hearing, will be subjected to discrimination by Defendant solely on the basis of disability.

200.     Defendant's actions described in this Complaint were intentional or were taken with deliberate indifference to the strong likelihood that pursuit of its questioned policies or practices would likely result in a violation of Ms. Montoya's federally protected rights.

201.     Plaintiff Montoya and Plaintiff CCDC's members have been injured, damaged and aggrieved by, and in the absence of the injunction requested herein will continue to be injured, damaged and aggrieved by, Defendant's discrimination.

### Third Claim for Relief
(Violation of Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-802)

202.     Plaintiffs reallege and incorporate by reference the allegations set forth in the remainder of this Complaint as if fully set forth herein.

203.     CADA provides:

An individual with a disability, as defined in section 24-34-301(5.6), must not, by reason of the individual's disability, be excluded from participation in or be denied the benefits of services, programs, or activities provided by a public entity, as defined in section 24-34-301, or a state agency, as defined in section 24-37.5-102, or be subjected to discrimination by any such public entity or state agency.

Colo. Rev. Stat. § 24-34-802(1)(b).

204.     Ms. Montoya is an individual with a disability as defined under CADA. *Id*. § 24-34-301(2.5) ('"Disability' has the same meaning as set forth in the federal 'Americans with Disabilities Act of 1990', 42 U.S.C. sec. 12101 et seq., and its related amendments and implementing regulations."); *see also* 42 U.S.C. §§ 12102(1)(A)-(B) (defining disability as a

"physical or mental impairment that substantially limits one or more major life activities of such individual"), 12102(2)(A) (including "hearing" and "speaking" as major life activities).

205. Defendant is a public entity within the meaning of CADA. *See* Colo. Rev. Stat. § 24-34-301(5.4) (defining "Public entity" to mean "[a]ny . . . local government; or [a]ny department, agency, special district, or other instrumentality of a state or local government").

206. Defendant excluded Ms. Montoya from participation in, and denied her the benefits of, its services, programs and activities, and subjected her to discrimination in violation of CADA, as more fully described in this Complaint.

207. Under CADA, "[a] court that hears civil suits pursuant to this section shall apply the same standards and defenses that are available under the federal 'Americans with Disabilities Act of 1990'["ADA"], 42 U.S.C. sec. 12101 et seq., and its related amendments and implementing regulations."' Colo. Rev. Stat. § 24-34-802(4).

208. Defendant is required to provide appropriate auxiliary aids and services, including sign language interpreters, to individuals who are deaf or hard of hearing because the ADA requires public entities to ensure effective communication with individuals with disabilities. *See id.* (applying ADA standards to CADA claims); 28 C.F.R. §§ 35.160(b)(1) (requiring a public entity to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity."), 35.160(a)(1) (requiring a public entity to ensure that communications with an individual with a disability are as effective as with others).

34

209.     Ms. Montoya has been, and will continue to be, injured, damaged and aggrieved by Defendant's discrimination.

210.     In the absence of appropriate and enforced policies, practices and procedures, Ms. Montoya and other deaf and hard of hearing individuals, including other CCDC members who are deaf or hard of hearing, will be subjected to discrimination by Defendant on the basis of disability.

211.     Plaintiff Montoya and Plaintiff CCDC's members have been injured, damaged and aggrieved by, and in the absence of the injunction requested herein will continue to be injured, damaged and aggrieved by, Defendant's discrimination.

<b><u>Prayer for Relief</u></b>

WHEREFORE, Plaintiffs respectfully pray:

1.     That this Court assume jurisdiction;

2.     That this Court issue an Order declaring Defendant to be in violation of Title II of the ADA, Section 504 and CADA;

3.     That this Court issue an injunction ordering Defendant to cease violating the rights of Plaintiff under the ADA, Section 504 and CADA and to adopt, implement and enforce policies, practices and procedures to ensure its compliance with Title II of the ADA, Section 504 and CADA;

4.     That this Court award Plaintiff Montoya damages;

5.     That this Court award Plaintiffs their reasonable attorneys' fees and costs; and

6.      That this Court award such additional or alternative relief as may be just, proper and equitable.

JURY DEMAND: Plaintiffs request this case be heard by a jury.

Dated: June 1, 2023                      Respectfully Submitted,

/s/ Andrew C. Montoya
**Andrew C. Montoya**
Kevin W. Williams
Colorado Cross-Disability Coalition Legal Program
1385 South Colorado Blvd., Suite 610-A
Denver, Colorado 80222
Phone: (303) 336-1036
Facsimile: (720) 420-1390
E-mail: amontoya@ccdconline.org
E-mail: kwilliams@ccdconline.org

*Attorneys for Plaintiffs*

36